KAREN NELSON MOORE, Circuit Judge,
dissenting.
The Supreme Court has repeatedly stated that “[cjredibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.” Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) (internal quotation marks omitted). Yet, the majority has made credibility determinations, weighed the evidence, and drawn inferences to conclude that Dr. Marvin Thrash was not discriminated against on account of his race in his application for tenure at Miami University (the “University”).[3] Because this case presents a genuine dispute over whether the stated reason for tenure denial is merely a pretext, I must respectfully dissent.
In this case, the parties primarily dispute whether the reason offered for the denial of tenure to Dr. Thrash was pretext for racial discrimination. See Maj. Op. at 518-19. In laying out the legal standard it will apply, the majority misrepresents Reeves v. Sanderson Plumbing, Inc.:
Regarding pretext, the Supreme Court has held:
“[A]n employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer’s decision, or if the plaintiff created only a weak issue of fact as to whether the employer’s reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.... ”
*524 Reeves, 530 U.S. at 14[8,120 S.Ct. 2097]. Id. This statement is not the holding of Reeves. Instead, as a concurrence in Reeves pointed out, “[t]he Court today-holds that an employment discrimination plaintiff may survive judgment as a matter of law by submitting two categories of evidence: first, evidence establishing a ‘prima facie case,’ ... and second, evidence from which a rational factfinder could conclude that the employer’s proffered explanation for its actions was false.” Id. at 154, 120 S.Ct. 2097 (Ginsburg, J., concurring);[4] see also id. at 148, 120 S.Ct. 2097 (majority opinion) (“[A] plaintiffs pri-ma facie case, combined with sufficient evidence to find that the employer’s asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.”).
The majority’s troubling view that judges can grant summary judgment “if the plaintiff created only a weak issue of fact as to whether the employer’s reason was untrue” is even more problematic because there is no “abundant and uncontro-verted independent evidence that no discrimination occurred” in this case as the Supreme Court dicta required. Moreover, “although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.” Id. at 151,120 S.Ct. 2097 (majority opinion).
In adjudicating Dr. Thrash’s case, the majority does not “give credence to the evidence favoring [him].” Id. The majority does not disregard contested evidence favorable to the University. The majority does not draw all reasonable inferences in Dr. Thrash’s favor. Instead, the majority makes credibility determinations in order to accept the University’s evidence. It also weighs this evidence against evidence submitted by Dr. Thrash to determine that a reasonable jury would side with the University. Finally, the majority simply ignores reasonable inferences that a jury could draw.
Dr. Thrash’s theory of the case is that his scholarship was strong enough to warrant tenure, but that the chair of his department, Dr. Lalvani, by devaluing African-American scholarship generally, and Dr. Thrash specifically, was principally responsible for the University’s conclusion that the scholarship was deficient. Dr. Thrash hoped to prove to a jury that his scholarship was sufficient and that Dr. Lalvani’s racial bias was the reason why Dr. Lalvani concluded (and convinced others) that the scholarship was deficient. Thus, each portion of Dr. Thrash’s argument should not be viewed in isolation. But this is precisely what the majority does.
For example, Dr. Thrash suggests that Dr. Lalvani viewed him differently from the start because he was hired as part of an affirmative-action program at the University. The majority isolates this fact and states “[w]e cannot conclude merely from the fact that Dr. Thrash was hired as an ‘opportunity hire’ that Dr. Lalvani harbored a negative view of either African-American scholarship or Dr. Thrash.” Maj. Op. at 518.[5] The majority reached *525 this conclusion by comparing the circumstances of the hiring with Dr. Lalvani’s testimony and statements that he wanted Dr. Thrash hired. Id. By crediting this testimony, the majority makes a credibility finding. A jury, however, is entitled to disbelieve this testimony by Dr. Lalvani that he wanted Dr. Thrash hired. Moreover, a jury is entitled to make reasonable inferences. For example, it could infer that while Dr. Lalvani did want another member added to his department — especially a member whose salary he did not have to pay out of his limited department budget — he still viewed Dr. Thrash as inferior to regular hires.
Other evidence of bias includes Dr. Lal-vani’s statement that he would not accept any reviewer from a historically black college or university (“HBCU”).[6] Rather than recognize this as evidence of racial bias,[7] the majority again usurps the jury’s role and weighs this evidence, in isolation, against other evidence it views as relevant. The majority compares the exclusion of all reviewers from HBCUs, evidence suggesting racial bias, with another piece of evidence that suggests no racial bias — that the majority of reviewers ended up being African Americans — and concludes that no “genuine issue of material fact exists regarding Dr. Lalvani’s opinion of African-American scholarship where Dr. Lalvani approved a majority African-American list of reviewers.” Maj. Op. at 518-19.
Dr. Thrash hoped to prove to a jury that the University’s conclusion that his scholarship was insufficient was based purely on Dr. Lalvani’s bias. The majority ignores the interconnected nature of the argument. Instead, the majority evaluates Dr. Thrash’s scholarship in isolation. By doing so, the majority flips the burden. Rather than requiring Dr. Thrash to proffer some evidence that the stated reason for the denial of tenure — that his scholarship was subpar — has no basis in fact, see Risch v. Royal Oak Police Dep’t, 581 F.3d 383, 391 (6th Cir.2009), the majority establishes that it should grant the motion for summary judgment as long as there is some evidence “which calls into doubt whether Dr. Thrash’s work was of sufficiently high quality to warrant tenure.” Maj. Op. at 522. The majority’s standard appears to be that in tenure denials, the applicant must prove that there was no doubt that his work was worthy of tenure.
It is not hard to see why Dr. Thrash singled out Dr. Lalvani as the cause of the denial of his tenure application. Dr. Lal-vani’s exclusion of HBCU reviewers is troubling. Moreover, Dr. Thrash’s prospects for tenure appear to be derailed at precisely the moment when Dr. Lalvani reviews Dr. Thrash’s scholarship. Significantly, many of the individuals who reviewed Dr. Thrash’s scholarly record after his fifth year and before the injection of Dr. Lalvani’s negative opinion deemed Dr. *526 Thrash’s record sufficient to warrant tenure. Dr. Thrash’s fifth-year review gave him high marks in teaching, scholarship, and service.[8] Dean Dollar, the dean of the University’s School of Engineering and Applied Sciences, concluded at this point that in his research Dr. Thrash was making good progress toward achieving tenure and told Dr. Thrash to apply for tenure that year rather than continuing to build his record. Similarly, the outside reviewers submitted evaluations of Dr. Thrash’s scholarly record that ranged from lukewarm (Forciniti) to positive (Pishko, Palmer) to enthusiastic (Ofoli, Barabino, Thompson). Members of Dr. Thrash’s department deemed that his research was adequate for tenure. Thus, Dr. Thrash presents a substantial amount of evidence that, before he was reviewed by Dr. Lalva-ni, the view of his research record including by members of his department, by outside reviewers, and by Dean Dollar was that it was sufficient to warrant tenure.
That assessment changes starkly after Dr. Lalvani’s review. Dr. Lalvani uniquely concluded that Dr. Thrash’s research record was insufficient. This assessment was then presented to every subsequent reviewer. Each subsequent reviewer, acknowledging that they greatly value the opinion of the department chair, Dr. Lalva-ni, then similarly concluded that Dr. Thrash’s scholarship was insufficient. Whether Dr. Thrash’s scholarship was sufficient to warrant tenure remains an open issue that must be considered by a jury in combination with evidence of Dr. Lalvani’s bias.
To prevail, Dr. Thrash must show that although Dr. Lalvani was not the decision-maker, his act of failing to recommend Dr. Thrash for tenure, motivated by his animus, was a proximate cause of the denial of tenure. I conclude that there is certainly enough evidence from which a jury could decide that Dr. Lalvani’s failure to recommend proximately caused the denial of tenure.
Too often, particularly in employment discrimination cases, judges decide for themselves what evidence juries will or will not believe or how they will weigh this evidence. Because a jury, not a judge, should determine whether evidence suggestive of bias proves bias, I respectfully dissent.

. The overuse of summary judgment has been criticized not only by civil procedure scholars, see, e.g., Arthur R. Miller, The Pretrial Rush to Judgment: Are the “Litigation Explosion," "Liability Crisis," and Efficiency Clichés Eroding Our Day in Court and Jury Trial Commitments?, 78 N.Y.U.L. Rev. 982, 1134 (2003) (stating that "[tjaking decisionmaking authority from juries runs counter to basic and long-cherished principles of our system”), but also by thoughtful judges, see, e.g., In re One Star Class Sloop Sailboat Built in 1930 with Hull No. 721, Named “Flash II", 517 F.Supp.2d 546, 555 (D.Mass.2007) (noting that commentators are in near unanimous agreement that federal courts overuse summary judgment as a case management tool); Mark W. Bennett, Essay: From the "No Spittin', No Cussin and No Summary Judgment” Days of Employment Discrimination Litigation to the “Defendant's Summary Judgment Affirmed Without Comment” Days: One Judge’s Four-Decade Perspective, 57 N.Y.L. Sch. L. Rev. 685 (2013); Patricia M. Wald, Summary Judgment at Sixty, 76 Tex L.Rev. 1897, 1935 (1998).

. The concurrence also provides that "circumstances in which plaintiffs will be required to submit evidence beyond these two categories ... will be uncommon.” Id. The Reeves majority acknowledges that its discussion is dicta. See id. at 149, 120 S.Ct. 2097 (noting that "[fjor purposes of this case, we need not — and could not — resolve all of the circumstances in which such factors would entitle an employer to judgment-").

. The majority was not asked to draw that conclusion merely from one piece of evidence. Where there is no smoking-gun proof of discrimination, no single piece of evidence typically shows discrimination. Instead, ju *525 rors, not judges, have to piece together the puzzle from multiple pieces.

. The majority notes in its fact section that Dr. Lalvani denies stating that he would not accept reviewers from HBCUs. Maj. Op. at 515. However, Dr. Lalvani's actions are consistent with this statement. If the jury believes that Dr. Lalvani made this statement, they could also view this denial by him as probative of an intent to conceal bias.

. The categorical labeling of all HBCU professors (no matter their race) as unqualified to provide reviews is without a doubt evidence of bias against African-American scholarship and African Americans in general. Imagine if Dr. Lalvani categorically rejected any professor, whether male or female, from colleges and universities that had in the past served only female students. One could certainly conclude that viewing the entire faculties of such schools as unqualified because they once taught only women suggests bias against women.

. The majority relies on earlier reviews that found Dr. Thrash’s scholarship to be lacking. See Maj. Op. at 522. The majority refuses to "look only to the fifth-year review,” id., but ignores the fact that each review is comparing the candidate to peers at the same career point. Thus, the fifth-year review does not suggest merely that Dr. Thrash performed well during his fifth year, but that as a fifth-year, tenure-track professor he is "making progress towards promotion and tenure.” R. 22-3 (Thrash dep. ex. 31) (Page ID #1011).